IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiffs,<br><br>vs.<br><br>YULIO CERVINO-HERNANDEZ, AND ALEXANDER CASTELLANO-BENITEZ,<br><br>  Defendants. | 4:15CR3114<br><br>**FINDINGS, RECOMMENDATION, AND ORDER** |

The defendants have moved to suppress all evidence seized during a search of the defendants' hotel room on September 21, 2015. ([Filing Nos. 47](#) & [57](#)). Defendants claim the search violated their Constitutional rights, and all evidence arising from that search must be suppressed. For the reasons stated below, the motion to suppress should be denied.

BACKGROUND

On the evening of September 21, 2015, dispatch for the Hastings Police Department ("HPD") received a call from a woman who reported receiving text messages from an unknown person soliciting sex in exchange for methamphetamine. HPD Officer Chad Daugherty contacted the woman, and reviewed and photographed the text messages. The messages indicated a man was looking for two women to spend the night with him and his friend in a hotel room. When Daugherty's supervisor, Sergeant Raelee Van Winkle, arrived at the scene, the officers used HPD computer programs to search for the phone number and identify the person sending the messages. They discovered the phone number was assigned to Texas, and it belonged to Defendant Yulio Cervino-Hernandez.

Cervino-Hernandez' text message suggested he wanted to meet the women at the local Wal-Mart. Van Winkle and Daugherty went to the Wal-Mart and searched the parking lot, but they were not able to find any vehicle with Texas license plates. The informant called dispatch again and informed the officers that, of her own accord, she had continued to text Cervino-Hernandez after the officers left her location. She reported Cervino-Hernandez had provided his location: Rodeway Inn, Room 110.

Van Winkle drove past the door of Room 110 at the Rodeway Inn. She saw two males smoking and a vehicle with Texas license plates. Since she was unable to record the license plate without drawing suspicion, she asked Daugherty to drive through the motel parking lot and gather the plate information. Ultimately, the officers were able to record the full license plate number, and after running the number through dispatch, they confirmed the vehicle was registered to Yulio Cervino-Hernandez.

The officers' criminal history search revealed Cervino-Hernandez was the subject of an active misdemeanor warrant out of Hall County, Nebraska. They reviewed a photograph of Cervino-Hernandez. Van Winkle consulted with Investigator M. Glenn Kemp from the Central Nebraska Drug and Safe Streets Task Force. Kemp decided that due to Cervino-Hernandez's transitory presence at the hotel, the officers would promptly execute the arrest warrant and conduct a "knock and talk" to perhaps uncover whether Cervino-Hernandez was offering to supply methamphetamine for sex. At that time, the officers believed they lacked probable cause to obtain a warrant to search the hotel room for drugs.

The officers met at the Garden Café a couple blocks north of the Rodeway Inn to discuss the situation and determine how the arrest warrant would be executed. They decided Van Winkle would remain at the Garden Café location watching with binoculars while the other officers went to the scene; Kemp would knock on the door of the hotel

room; and Deputy Sheriff Mike Poplau and Daugherty, who were both in uniform, would stand several feet away on opposite sides of the motel room door.

Kemp knocked on the door of Room 110. At first, he noticed no movement in the room and no light inside. The curtains were drawn. But after Kemp knocked a second time, the curtains shifted and Kemp saw someone peering out the window and light emanating from a television in the room. Kemp gestured with his hand for the man at the window to come to the door. The man left the window and Kemp knocked one more time. The man answered the door. His whole body was visible in the door frame. Kemp immediately recognized the man as Cervino-Hernandez by his physical appearance, including the presence of a mole on his left cheek. Kemp asked the man if he was Yulio. The man nodded affirmatively. Kemp then identified himself and stated that he had a warrant for Cervino-Hernandez's arrest.

To execute the arrest, Kemp reached out with his right hand to grab Cervino-Hernandez's right wrist. Cervino-Hernandez responded by backing into the hotel room. Kemp maintained his hold on Cervino-Hernandez's wrist and followed Cervino-Hernandez's movements into the room. Poplau entered the room quickly behind Kemp to assist him. Daugherty followed Paplau. Kemp handed Cervino-Hernandez off to Daugherty to be handcuffed and taken into custody. Poplau went further into the hotel room and entered the bathroom while Kemp scanned the rest of the motel room. Both officers were using a flashlight and, for officer safety, determining if others were present. Kemp saw a second male lying on the furthest bed from the entry door (the south bed); torn plastic bags on the floor; beer bottles and torn plastic bags in the trash can; and a clear drinking glass containing white crystalline powder on the television stand. Kemp also noticed a strong odor of acetone.

Kemp has 36 years of law enforcement experience, and having served on the Central Nebraska Safe Streets and Drug Task Force since the 1990s, he has extensive drug training and experience. He teaches classes for the Drug Enforcement Administration on drug identification, dismantling methamphetamine labs, and the various methods of manufacturing/cooking methamphetamine, including the "red phosphorus method," (primarily used in Mexico), and the "Birch method," (commonly used in Nebraska). Kemp has encountered methamphetamine in its various forms thousands of times throughout his career.

After the protective sweep was completed, Kemp turned his attention to the man on the south bed. Kemp asked the man to raise his hands so that they were visible and asked the man who he was. The man responded that his name was "Alex" (later identified to be Defendant Alex Castellano-Benitez). At this point, Daugherty was standing in the doorway of the room, Poplau was standing near the foot of the south bed, and Kemp was standing between the two beds with Castellano-Benitez. Kemp asked Castellano-Benitez for identification so he could search for any pending warrants. Castellano-Benitez turned on the nightstand lamp and began looking around the nightstand and bed for his wallet. Castellano-Benitez looked in the nightstand drawer, then proceeded to lift the mattress of the south bed, and then both the mattress and box spring of that bed. The hotel beds were supported by a wooden frame that created a hidden cavity under the box spring.

With the box spring elevated, Castellano-Benitez located his wallet and grabbed it. But during this lift, the officers were able to see into the bed frame's cavity. Kemp saw another wallet, and two small white bags that Kemp believed were one-ounce packages of methamphetamine wrapped in "bindle bags" (the corner of cut-up plastic shopping bags). Kemp asked, "What's that?" Castellano-Benitez dropped the box spring. Kemp

4

then asked again "What was that other wallet?"[1] Kemp asked Castellano-Benitez to lift the box spring a second time. Castellano-Benitez did so, and the officers gained another view of the items under the bed. During this second lift, Kemp saw a plastic bag toward the center of the bed that contained a black brick. The brick was split open, revealing white-crystalline methamphetamine. Kemp asked Castellano-Benitez "What's that?" Castellano-Benitez responded that he did not know; that the items were not his.

Kemp again turned to Castellano-Benitez and asked "if there was anything under the other bed?" Castellano-Benitez replied "a little bit." Without any request to do so, Castellano-Benitez then lifted the box spring of the north bed. Once lifted, Kemp and Van Winkle, who was now in the room, saw a silver scale and a truck battery under the bed. Castellano-Benitez stated the items were not his. Poplau arrested Castellano-Benitez for possession of methamphetamine.

Van Winkle then saw a piece of paper containing a woman's name and phone number on top of the refrigerator in the room. The paper contained the phone number of the woman who received Cervino-Hernandez's text messages and the name of her roommate who shared the phone.

While Kemp was waiting for Castellano-Benitez to locate his identification, he saw other items in the room, including a bundle wrapped in a corner of a shopping bag and a pair of scissors on a table next to the television stand. Officers seized all the items they saw around the room and under the beds. Officer did not look any further and did not obtain a warrant or return to the room. The officers never drew their weapons during the entire encounter at the motel.

---

[1] Kemp asked about the second wallet because Cervino had previously claimed his wallet (and identification) had been left in Phillips, Nebraska with a friend.

## LEGAL ANALYSIS

Defendants argue that while Cervino-Hernandez could be lawfully arrested, the officers' entrance and search of the room violated Defendants' constitutional rights. Additionally, they argue any search incident to the arrest of Cervino-Hernandez did not justify the officers searching the entire hotel room.

For the purposes of the Fourth Amendment, an arrest warrant "implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Payton v. New York, 445 U.S. 573, 603 (1980). And officers may make warrantless protective sweeps in conjunction with an arrest where the officer reasonably believes the area inspected could harbor individuals who pose a danger to the officer or others. Maryland v. Buie, 494 U.S. 325, 327 (1990). The protective sweep must be narrowly confined to a cursory visual inspection of those places in which a person might be hiding. Id.

The officers were lawfully at Defendants' hotel room to execute an arrest warrant. Once Cervino-Hernandez answered the door and was positively identified, Kemp stated Cervino-Hernandez was under arrest and grabbed Cervino-Hernandez's right wrist. Rather than stay by the front door, Cervino-Hernandez backed into the hotel room with Kemp holding on. With Kemp now in the room itself, other officers entered the hotel room to assist with the arrest. Under the facts presented, the officers were effectuating a lawful arrest, and their entry into the hotel room did not violate Defendants' Fourth Amendment rights.

Even if Cervino-Hernandez had not retreated into the room, under Buie, officers had the right to enter the room to perform a protective sweep to determine whether others may be in the room that could pose a danger to the officers. Prior to their arrival at Room

110, the officers had reason to believe Cervino-Hernandez was not alone. Cervino-Hernandez's text messages had asked for two women, explaining he was with a friend, and when Sergeant Van Winkle drove past the hotel room before the arrest, she saw two people smoking on the sidewalk outside that room. During and immediately following Cervino-Hernandez's arrest, officers performed a protective sweep to assure that others within that hotel room posed no danger. This protective sweep, done with flashlights due to low lighting, was quickly performed and included only those areas where a person could hide.

Based on the credible facts, the court finds the officers lawfully entered Defendants' motel room and they lawfully performed a protective sweep to search for Cervino-Hernandez's companion or others.

### 1. Items in Plain View

"[O]fficers may seize an object without a warrant if they are lawfully in a position from which they view the object, the incriminating character of the object is immediately apparent, and the officers have a lawful right of access to the object." United States v. Beaseley, 688 F.3d 523 (8th Cir. 2012) (quoting United States v. Muhammad, 604 F.3d 1022, 1027 (8th Cir. 2010)). The requirement that "the incriminating character of an item be immediately apparent, is satisfied when police 'have probable cause to associate the property with criminal activity.'" Banks, 514 F.3d at 773.

Immediately upon entering the motel room, Kemp noticed several indicators of methamphetamine manufacture and distribution. He smelled the odor of acetone (a chemical used in the Birch method for manufacturing methamphetamine), and he saw torn or cut-up plastic shopping bags (items used in packaging methamphetamine for

7

distribution), and a plastic cup containing what appeared to be methamphetamine crystals.

After finding Castellano-Benitez, the officers asked for his identification. That request was not unlawful. Even when law enforcement officers have no basis for suspecting a particular individual, they may lawfully ask for that person's identification. [United States v. Drayton, 536 U.S. 194, 201 (2002)](). While waiting for Castellano-Benitez to find his identification, Kemp noticed a corner of a plastic bag that appeared to contain methamphetamine on a table and scissors believed to be used for cutting plastic bags to create methamphetamine packaging.

The officers were lawfully in the room when they made these observations. And before arriving on the scene, they were aware that methamphetamine may be present. The officers did not move or manipulate anything within the motel room before they smelled acetone and saw items indicative of methamphetamine manufacture and trafficking. These items were in plain view. Based on their prior knowledge and the totality of their observations, the officers believed items within the motel room were being used for illegal drug trafficking. The officers' seizure of these items did not violate the Fourth Amendment.

### 2. Items Under the Bed

Immediately after handing Cervino-Hernandez off to Daugherty, Kemp asked Castellano-Benitez who he was and requested his identification. In response, Castellano-Benitez began looking for his wallet. Neither Kemp nor any other officer directed Castellano-Benitez on where or how to perform this search. They did not order him to open any drawer or lift the mattress. However, when Castellano-Benitez lifted the mattress and box spring, Kemp immediately saw two wallets and two small bags "bindle

8

bags," each containing what appeared to be one ounce of methamphetamine in the cavity under the bed. These observations were not the product of a search by the police, but were brought into plain sight due to the voluntary actions of Castellano-Benitez when looking for his identification. See United States v. Newberry, 990 F.2d 1264 (9th Cir. 1993) (holding firearm was seen in plain view where defendant opened his briefcase for his identification in front of officers and officer testified she immediately saw the firearm within the case); United States v. Jones, 2011 WL 2118708 (W.D. Penn. May 25, 2011) (holding officers lawfully saw drugs in plain view when woman voluntarily opened her purse to obtain her identification and officers saw the drugs within).

The officers did not violate Defendants' rights when they seized the items observed during Castellano-Benitez' first lift of mattress and box spring on the south bed.

### 3. Consent to Remaining Search

Defendants assert Castellano-Benitez' actions in lifting the south bed a second time and then lifting the north bed were not consensual and violated their Fourth Amendment Rights. Although Castellano-Benitez lifted the beds himself, Defendants claim Castellano-Benitez merely acted under Investigator Kemp's orders: The officers "might as well have been searching themselves."

The government bears the burden of proving, by a preponderance of the evidence, that Castellano-Benitez' actions were voluntary. United States v. Bearden, 780 F.3d 887, 895 (8th Cir. 2015) (citation omitted). The court looks at the totality of the circumstances when deciding if a defendant voluntarily cooperated with an officer's requests or, in the alternative, was coerced to do so. Id.; United States v. Saenz, 474 F.3d 1132, 1136 (8th Cir. 2007). The proper inquiry "is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." Drayton, 536 U.S. at 202.

9

When determining if an encounter with officers is consensual, the court considers the defendant himself: his age, intelligence and education; whether he cooperated with police; his knowledge of his right to refuse consent; and his familiarity with arrests and the legal system. [Bearden, 780 F.3d at 895](). The court also considers the environment in which consent was given and the actions of the officers: "whether the police treated, intimidated, punished, or falsely promised something to the defendant; whether the defendant was in custody or under arrest when consent was given and, if so, the length of that detention; and whether consent occurred in a public or secluded area." [Id.]() (citations omitted). Finally, the court examines the actions of the defendant, for example, whether he was silent as the search was conducted and whether he was cooperative with the officers. [Id.](); [Saenz, 474 F.3d at 1136]().

Defendants were adults at the time of their arrest. Although there were three officers present in the motel room, Castellano-Benitez was not under arrest or handcuffed when Kemp asked about the second wallet under the south bed and when he asked if anything was under the north bed. The officers never drew or purposefully displayed their weapons, and Castellano-Benitez was not threatened, punished, intimidated, or promised anything to prompt Castellano-Benitez to lift the north bed or to lift the south bed a second time. The motel room encounter lasted only a few moments: Kemp turned his attention from Cervino-Hernandez to Castellano-Benitez only a couple of minutes after Cervino-Hernandez opened the door of the motel room. Thereafter, the officers' entire contact with Castellano-Benitez lasted less than ten minutes.

Throughout this encounter, Castellano-Benitez cooperated and openly communicated with the officers. Castellano-Benitez began looking for his identification as soon as Investigator Kemp requested it. After Castellano-Benitez retrieved his wallet from the cavity under the bed, Kemp asked "what's that?" and asked Castellano-Benitez

to lift the box spring a second time. Castellano-Benitez informed the officers that he did not know what the items were and that they were not his.[2] After this exchange, Kemp inquired whether there was "anything else," Castellano-Benitez responded "a little bit" and without further questions or prompting, Castellano-Benitez lifted the north bed, revealing the scale and truck battery. Castellano-Benitez denied that these items were his.

Examining a totality of the circumstances, the court concludes that Castellano-Benitez voluntarily cooperated with the officers when answering their questions and responding to their requests. The officers did not violate the Fourth Amendment when they asked about additional evidence in the room, including asking Castellano-Benitez to lift the south bed a second time. And they did not violate the Fourth Amendment when they seized items in plain view when the south bed's box spring was lifted a second time, and when Castellano-Benitez lifted the mattress and box spring for the north bed.

CONCLUSION

Kemp and the other officers were lawfully present in the motel room to execute an arrest warrant, and lawfully performed a protective sweep as part of executing that arrest. They did not violate the Fourth Amendment by asking Castellano-Benitez for identification. Castellano-Benitez' conduct and cooperation with the officers thereafter, including lifting the beds and revealing evidence of illegal drug activity hidden thereunder, was voluntary and consensual. Upon seeing, in plain view, packages which appeared to contain illegal drugs along with items used for manufacturing and packaging methamphetamine, the officers lawfully seized those items and arrested Castellano-Benitez.

---

[2] With the exception of his wallet, Castellano-Benitez denies the items under the bed were his. The court therefore questions whether he has any standing to claim these items were unlawfully seized. The parties did not brief this issue.

11

Having concluded the officers did not violate the defendants' Fourth Amendment rights,

IT IS RECOMMENDED to the Honorable John M. Gerrard, United States District Judge, pursuant to [28 U.S.C. § 636](b), that the motions to suppress filed by the defendant ([Filing Nos. 47](#) & [57](#)) be denied in their entirety.

The defendants are notified that failing to file an objection to this recommendation as provided in the local rules of this court may be held to be a waiver of any right to appeal the court's adoption of the recommendation.

IT IS ORDERED that the jury trial of this case is set to commence before John M. Gerrard, United States District Judge, in Courtroom 1, United States Courthouse, Lincoln, Nebraska, at 9:00 a.m. on May 31, 2016 or as soon thereafter as the case may be called, for a duration of three (3) trial days. Jury selection will be held at the commencement of trial.

Dated this 28th day of April, 2016

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.